*This opinion is subject to revision before final publication in the Pacific Reporter*

**2026 UT 14**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

JENNIFER MCCAFFREY, *et al.,*\*
*Appellees,*

*v.*

DEREK ANDERSON,
*Appellant.*

No. 20251357
Heard February 27, 2026
Filed July 2, 2026

On Direct Appeal

Third District Court, Summit County
The Honorable Matthew Bates
No. 250500258

Attorneys:\*\*

Janet M. Conway, Wanship, C. Michael Judd, Salt Lake City,
for appellees

Troy L. Booher, Caroline A. Olsen, Taylor P. Webb, Salt Lake City,
for appellant

JUSTICE NIELSEN authored the opinion of the Court,
in which JUSTICE PETERSEN, JUDGE CHRISTIANSEN FORSTER,
JUDGE ORME, JUDGE CHIARA, JUDGE FONNESBECK,
and JUDGE LARSEN joined.

---

\*Additional appellees: Kurt Larsh, Kris Klein, Patsy Klein, Tyler Gough, Chanelle McGregor, Lindy Sternlight, Dan Sternlight, Scott Earl, and DeEtte Earl.

\*\*Additional attorneys: Derek E. Brown, Att'y Gen., Sarah Goldberg, Keith W. Barlow, Asst. Solics. Gen., Salt Lake City, for appellee Lieutenant Governor Deidre M. Henderson.

Having recused themselves, CHIEF JUSTICE DURRANT and ASSOCIATE CHIEF JUSTICE POHLMAN do not participate herein; COURT OF APPEALS JUDGE MICHELE M. CHRISTIANSEN FORSTER and DISTRICT COURT JUDGE ANGELA F. FONNESBECK sat.

DISTRICT COURT JUDGES SAMUEL P. CHIARA and MANDY LARSEN sat as sixth and seventh members of the Court.***

JUSTICE HAGEN stepped down from the court before this case was decided. COURT OF APPEALS JUDGE GREGORY K. ORME, having reviewed the briefs and listened to a recording of the oral argument, substituted for JUSTICE HAGEN and participated fully in this decision.

JUSTICE JORGENSEN and JUSTICE DENT became members of the Court after oral argument in this matter and did not participate.

———————————

JUSTICE NIELSEN, opinion of the Court:

## INTRODUCTION

¶1    Derek Anderson wanted to form a new town called West Hills along Highway 248 between Hideout and Kamas. Getting an incorporation question on the ballot requires a sponsor like Anderson to run a gauntlet of proposals, notices, and hearings, often with multiple adjustments to the municipal map along the way.

¶2    Under the incorporation code,[1] an incorporation sponsor first proposes new municipal boundaries. That map must comply with various requirements, like sweeping in sufficient would-be inhabitants and land. The sponsor then submits the proposed map to the Lieutenant Governor's office and requests that she do a feasibility study.

———————————

***As of January 31, 2026, "The Supreme Court consists of seven justices." Utah Code § 78A-3-101(1).

[1] *See* UTAH CODE §§ 10-2a-201 to -220 (2022). Because the Legislature has since materially amended the incorporation code, we cite and apply the version in effect at the time Anderson brought his petition, in April 2023. *State v. Clark*, 2011 UT 23, ¶ 13, 251 P.3d 829 ("[W]e apply the law as it exists at the time of the event regulated by the law in question.").

¶3    Before ordering the study, the Lieutenant Governor sends out notice to would-be inhabitants, some of whom (called "specified landowners") have the chance to opt out of the proposed municipality if certain conditions are met. If the opt-outs render the proposed map statutorily noncompliant, the sponsor can then redraw it. If the redrawn boundaries comply with the code, the Lieutenant Governor orders the study.

¶4    Once the feasibility study is done, the Lieutenant Governor sets two public hearings. After the first hearing, specified landowners have another chance to opt out. If those opt-outs defeat the proposed map, the sponsor can redraw it a second time and make an amended request for a feasibility study. If the amended request complies with the code, the Lieutenant Governor sets a second public hearing. There is no third chance for specified landowners to opt out at this point, even though some of them—having been added for the first time in the third proposed map—may not have had any prior chance to opt out.

¶5    After Anderson went through all these steps, the Lieutenant Governor determined that the West Hills proposal satisfied the statutory requirements and certified the incorporation petition for the 2025 general election.

¶6    Appellees are a group of landowners (Landowners) who sued to stop the incorporation election. Anderson added them to the final modified map between the first and second public hearings, after the statutory right to request exclusion from the proposed boundaries had (twice) passed. They argued on summary judgment that the incorporation code violates section 24 of article I of the Utah Constitution—the Uniform Operation of Laws Clause—by allowing certain landowners to request exclusion while depriving similarly situated landowners of that same privilege.

¶7    The district court granted Landowners' motion for summary judgment. It recognized that no suspect class nor fundamental right was at issue and conducted a rational basis review. It ruled that the incorporation code's classification of landowners fails rational basis scrutiny because it creates classifications that are unreasonable and not reasonably connected to the legislative purpose of the code. Specifically, the district court ruled that the classification of landowners unreasonably "arises from an arbitrary legislative decision to lock the boundaries of the municipality after the first public hearing" and "puts the

determination of which specified landowners can request exclusion in the hands of the sponsor," while only having a "tenuous" relationship to any legislative purpose.

¶8   The district court was correct to apply rational basis review but erred in its analysis. Courts declare a legislative classification unconstitutional under this standard only if they cannot think of "any rational or reasonable basis" for the classification. *DIRECTV v. Utah State Tax Comm'n*, 2015 UT 93, ¶ 51, 364 P.3d 1036 (cleaned up). Here there is at least one reasonable basis for the landowner classification that the district court acknowledged (though it ultimately found it "unpersuasive"): the need to prevent endless boundary modifications and repeated feasibility studies. Cutting off exclusion rights at a certain point locks the boundaries and moves the incorporation process forward. Any potential for gamesmanship is mitigated by other safeguards—such as feasibility requirements and the incorporation election itself. And while we acknowledge Landowners' frustration that they will not have the same exclusion rights enjoyed by their neighbors, the legislature had to draw the line somewhere. *See Bingham v. Gourley*, 2024 UT 38, ¶ 36, 556 P.3d 53. That is enough to pass rational basis review.

¶9   Accordingly, we hold that the incorporation code's scheme of exclusion rights does not violate the Uniform Operation of Laws Clause. And under the circumstances of this case, we decline to reach Landowners' argument that the original or historic interpretation of the Uniform Operation Clause provides an alternative ground for affirmance.

¶10 We reverse and reinstate the Lieutenant Governor's certification of the incorporation petition for the 2026 general election.

## BACKGROUND

¶11  Before recounting the facts and procedural history here, it helps to understand the statutory context within which they took place. Under Utah's municipal incorporation code, UTAH CODE §§ 10-2a-201 to -220 (2022), a private-citizen sponsor wishing to incorporate a town draws proposed boundaries that must include at least 100 people and meet density and contiguity requirements. *Id.* §§ 10-2a-201.5, -202 (2022). The sponsor submits a request for a feasibility study with the Lieutenant Governor, who notifies all landowners in the boundaries of the proposed town. *Id.* §§ 10-2a-202, -203(2)(a) (2022). Within thirty days of receiving this notice, a

"[s]pecified landowner"—a landowner who owns property valued at more than 1% of the assessed value of the land or owns 10% of the private land area within the proposed town's boundaries—may request that the Lieutenant Governor exclude the landowner's property from the proposed incorporation. *Id.* § 10-2a-203(1)(c), (3) (2022). The Lieutenant Governor must grant the request unless the property receives a majority of its municipal services from the county and the exclusion will leave an unincorporated island within the proposed town. *Id.* § 10-2a-203(4) (2022).

¶12 If the Lieutenant Governor grants enough exclusion requests that the proposal no longer meets statutory requirements, the sponsor may modify the boundaries and submit an amended feasibility study request. *Id.* §§ 10-2a-204, -205(4)(a)(ix), -206 (2022). If the amended request is certified, the Lieutenant Governor hires an independent consultant to conduct the feasibility study and determine the viability of the proposed town. *Id.* § 10-2a-205 (2022).

¶13 If the proposed town passes its feasibility study, the Lieutenant Governor then holds two public hearings. *Id.* § 10-2a-207(2) (2022). The first public hearing triggers a second exclusion window for specified landowners, who once again have thirty days to opt out. *Id.* § 10-2a-207(5)(a) (2022).

¶14 If the Lieutenant Governor grants any exclusion requests at this point, the sponsor must request a supplemental feasibility study, which may again include changes to the proposed boundaries. *Id.* §§ 10-2a-207(5)(d)(i), -206(1)(a) (2022). If the supplemental feasibility study passes muster, the Lieutenant Governor then holds a second public hearing. *Id.* § 10-2a-207(6) (2022). But unlike the first public hearing, the code does not permit specified landowners to request exclusion from the proposed town after the second public hearing. *See id.* § 10-2a-207(6), (9)(a)(iii) (2022).

¶15 Once the public hearing process is complete, the sponsor has a year to submit an incorporation petition with signatures from 10% of all registered voters within the boundaries. *Id.* § 10-2a-208(1) (2022). If the incorporation petition complies with all applicable requirements, the Lieutenant Governor must certify the petition and schedule an incorporation election for the town, "to be held on the date of the next regular general election." *Id.* § 10-2a-210(1)(a) (2022); *see also id.* § 10-2a-209 (2022). "If a majority of those who vote in an incorporation election . . . vote[] in favor of incorporation, the area shall incorporate." *Id.* § 10-2a-210(6) (2022).

¶16 The relevant facts are not disputed. Derek Anderson sought to incorporate a town called West Hills between Hideout and Kamas in Summit County. He filed a request for a feasibility study with the office of the Lieutenant Governor in April 2023. The Lieutenant Governor provided notice to all landowners of the intent to incorporate and the opportunity for exclusion. The Lieutenant Governor certified Anderson's request and commissioned a feasibility study, which was favorable.

¶17 The Lieutenant Governor then published notice of the first public hearing to present the results of the feasibility study. That notice advised all specified landowners of the deadline to exercise their exclusion rights. Approximately fifty specified landowners exercised their right to be excluded.

¶18 Anderson then submitted second and third modified requests for a feasibility study with updated boundaries. The Lieutenant Governor's office certified the third modified request, and the final modified feasibility study was completed in late 2024. After a second public hearing, Anderson submitted a petition to place the incorporation of West Hills on the ballot. The Lieutenant Governor certified the incorporation measure for a vote during the November 2025 election.

¶19 Appellees Jennifer McCaffrey, Kurt Larsh, Kris and Patsy Klein, Tyler Gough, and Chanelle McGregor are specified landowners whose properties were added to the modified boundaries by Anderson after the statutory deadline to request exclusion had passed.[2] These Landowners filed suit asking the district court to enjoin the Lieutenant Governor from certifying the question of West Hills's incorporation on the ballot. Relevant here, they claimed that the code's unequal treatment of landowners violates the Uniform Operation of Laws Clause of the Utah

---

[2] Four Appellees (Lindy and Dan Sternlight, and Scott and DeEtte Earl) are property owners whose property is not within the proposed boundaries of West Hills, but who nevertheless seek to block incorporation. Though there is some dispute as to whether these four landowners have standing to pursue the uniform operation claim at issue in this appeal, the district court ruled that it could grant Landowners' motion for summary judgment without resolving the question because at least one landowner had standing. We likewise do not reach the standing question here.

Constitution, which states, "All laws of a general nature shall have uniform operation." UTAH CONST. art. I, § 24.

¶20 Landowners moved for summary judgment on their uniform operation claim. They argued that the incorporation code discriminates against certain landowners (those added after opt-outs were available) for no legitimate reason. Anderson opposed and filed his own motion for summary judgment. The Lieutenant Governor took no position on the constitutional arguments and asserted only that she properly followed all applicable statutory procedures.

¶21 The district court granted summary judgment to Landowners. It applied our so-called "modern interpretation" of uniform operation and found that the incorporation code creates classifications and operates to treat similarly situated landowners within those classifications disparately. The court then conducted a rational basis review and ruled that the code's disparate treatment of landowners was not reasonable because the boundaries lock after the first public hearing for no apparent reason, and because the sponsor can manipulate the boundaries so that late-added landowners have no exclusion rights. The court also ruled that this disparate treatment is not reasonably related to the legislative purposes of certainty or preventing endless boundary modifications.

¶22 Anderson appealed.[3]

### STANDARD OF REVIEW

¶23 On review of a district court's grant of summary judgment, we review both the district court's "legal conclusions and ultimate

---

[3] Anderson first sought emergency relief from this court under rule 19 to allow the incorporation election to occur in November 2025. We denied the petition on October 28, 2025, ruling that "[u]nder the unique circumstances of this case, [the sponsor] has not persuaded us to exercise our discretion to grant extraordinary relief given the potential disruption to the election process by issuing a writ at this juncture." *Anderson v. Hon. Bates*, 2025 UT 51, ¶ 5, 582 P.3d 728. We issued a written opinion elaborating our reasons for denying the petition on November 6, 2025, noting that the denial was "without prejudice to the sponsor appealing the district court's order in the ordinary course." *Id.* ¶ 42.

grant or denial of summary judgment for correctness." *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (cleaned up).

## ANALYSIS

¶24 Anderson argues that the district court erred in its rational basis analysis under the modern meaning of the Uniform Operation Clause because there were multiple rational bases on which the legislature could cut off opt-outs at the point that it did. We agree. Though Landowners argue that we should exercise our discretion to affirm on an alternative basis—that the incorporation statutes violate the original meaning of the Uniform Operation Clause—we decline that invitation based on how the litigation unfolded here.[4]

I. UNDER THE MODERN FORMULATION OF THE UNIFORM OPERATION OF LAWS CLAUSE, STATUTES NOT AFFECTING FUNDAMENTAL RIGHTS PASS MUSTER SO LONG AS THERE IS A RATIONAL BASIS FOR THEM

¶25 Under our modern formulation of Utah's Uniform Operation Clause, "A statute is not uniform in its operation, and is thus unconstitutional, if (1) the statute creates any classifications, (2) those classifications impose any disparate treatment on persons similarly situated, and (3) the legislature had no reasonable objective that warrants the disparity." *State v. Outzen*, 2017 UT 30, ¶ 16, 408 P.3d 334 (cleaned up).

¶26 The first two steps of this analysis are largely undisputed in this case. The code classifies certain landowners as "specified landowners," depending on the size or value of their property. It then subclassifies specified landowners into two groups relevant here: those whose property is added to the proposed boundaries *before* the first public hearing, and who thus have exclusion rights; and those whose property is added to the proposed boundaries *after* the first public hearing, who do not have any exclusion rights. The law thus treats similarly situated landowners differently based

---

[4] Because we reverse the district court and hold that the incorporation code's scheme of exclusion rights does not violate the Uniform Operation Clause, we do not address Anderson's alternative arguments that the district court erred in treating Landowners' facial challenge as an as-applied constitutional challenge, or that Landowners failed to meet their burden in bringing an as-applied challenge.

on when their property is added to the proposed boundary by the incorporation sponsor. *See State v. Angilau*, 2011 UT 3, ¶¶ 22–23, 245 P.3d 745 (concluding the first two prongs of uniform operation claim satisfied because the relevant statute treated sixteen-year-olds who committed murder differently than similarly situated fifteen-year-olds who committed murder).

¶27 The third step—analyzing "the legislature's reasonable objectives underlying the disparate treatment"—requires us to "determine the level of scrutiny that must be applied to the statutory scheme." *Outzen*, 2017 UT 30, ¶ 16 (cleaned up). "Where a legislative enactment implicates a fundamental or critical right or creates classifications which are considered impermissible or suspect in the abstract, we apply a heightened degree of scrutiny. But where there is no suspect classification at work and no apparent fundamental right at issue, we apply a rational basis review." *Id.* (cleaned up).

¶28 We agree with the district court that no suspect class or fundamental right is at stake and apply rational basis scrutiny—"a low bar under which classifications employed by the legislature are presumptively permissible." *Taylorsville City v. Mitchell*, 2020 UT 26, ¶ 43, 466 P.3d 148 (cleaned up). In conducting this inquiry, "a classification is reasonably related to its legitimate objectives" if (1) "the classification is reasonable," (2) "the objectives of the legislative action are legitimate," and (3) "there is a reasonable relationship between the classification and the legislative purpose." *Id.* (cleaned up). The standard is "quite generous: any rational or reasonable basis for legislative classification is sufficient, meaning that any legitimate governmental objective suffices, and any reasonable relationship between classification and purpose is adequate." *Tischmak v. Utah State Tax Comm'n*, 2025 UT 24, ¶ 39, 574 P.3d 63 (cleaned up).

¶29 We hold that the classification creating different exclusion rights for landowners is a reasonable time-based line; that the objectives of providing certainty, protecting landowners, and preventing endless boundary modifications during the incorporation process are legitimate; and that the landowner classification scheme is reasonably related to these objectives.

A. *The Statutory Classification Treating Later-added Landowners Differently Than Earlier-added Ones In The Incorporation Process Is Reasonable*

¶30 The district court ruled that the classification dividing specified landowners into those with opt-out rights and those without is "not reasonable on its face because it arises from an arbitrary legislative decision to lock the boundaries of the municipality after the first public hearing" and "grant[s] a right to some and not to other similarly situated citizens merely for the sake of ending debate." We disagree.

¶31 A time-based line is inherently arbitrary on some level, but that does not make it unreasonable. We have repeatedly upheld time-based lines in various statutory contexts. *See, e.g., Bingham v. Gourley*, 2024 UT 38, ¶¶ 54–55, 556 P.3d 53 (holding the medical malpractice four-year statute of repose reasonable); *Angilau*, 2011 UT 3, ¶ 28 (upholding the age-based line in criminal prosecution statute while acknowledging that such a line "will necessarily appear somewhat arbitrary, because people close to the boundary on either side may be very similarly situated"); *Jacobs v. Hafen*, 917 P.2d 1078, 1081 (Utah 1996) (holding that statute of limitations was a reasonable line-drawing exercise because "parties need a time certain within which they can assert their ownership rights" while also preventing unfair surprise); *State v. Loughton*, 747 P.2d 426, 429 (Utah 1987) (upholding classification based on age of victim, even though "it may be difficult to distinguish between a particular" child on either side of the line); *see also Gregory v. Ashcroft*, 501 U.S. 452, 473 (1991) (upholding state law mandating judicial retirement at age 70, even though "[i]t is far from true that all judges suffer significant deterioration in performance at age 70. It is probably not true that most do. It may not be true at all.").

¶32 Thus, even if appearing arbitrary, we see no evidence that the legislature drew this time-based line for the mere sake of ending debate. Indeed, an incorporation debate may actually *intensify* when boundaries are set, stakes become clear, and opposing sides prepare for the municipal election.

¶33 Landowners and the district court also worry that the classification allows the incorporation sponsor to strategically decide which specified landowners will be able to request

exclusion and which will not.[5] That is an understandable concern, but while we acknowledge the possibility for gamesmanship, the sponsor's influence is necessarily checked by other safeguards in the code. Population, density, and contiguity requirements prevent willy-nilly line drawing. And the ultimate safeguard is the incorporation election itself, where the voters—not the sponsor— make the ultimate call on the boundaries. This mitigates the gamesmanship concern.

¶34 While there might be *better* ways to draw the line to avoid the potential for gamesmanship while ensuring exclusion rights, "perfection is by no means required," *Spencer v. Utah State Bar*, 2012 UT 92, ¶ 27, 293 P.3d 360 (cleaned up), and "any rational or reasonable basis for legislative classification is sufficient" to pass rational basis review, *Tischmak*, 2025 UT 24, ¶ 39 (cleaned up). At the very least, it was rational to end exclusion rights and lock boundaries after the first hearing because there must be an end to opt-outs sometime; otherwise, there would potentially be no end to the preliminary stages of the incorporation process. With this line, there can be an end to the preliminary stages and a beginning to the electoral stage. We uphold the classification as reasonable on that basis.

### B. The Legislative Objectives Of Ensuring Finality And Favoring Incorporation Are Legitimate

¶35 The parties dispute the legislative purposes behind the incorporation code. According to Anderson, the purposes include encouraging incorporation and promoting finality in the incorporation process. Landowners say the main purpose is to protect the rights and interests of landowners during that incorporation process.

¶36 Though the parties disagree on primacy of purpose, their proposed purposes are not mutually exclusive. There is "often more than one purpose behind legislation." *Mitchell*, 2020 UT 26, ¶ 44. "[M]ost legislation . . . is not aimed at advancing a single objective at the expense of all others, but instead is a result of a legislative give-and-take that balances multiple concerns." *VCS, Inc. v. Utah Cmty. Bank,* 2012 UT 89, ¶ 20, 293 P.3d 290 (cleaned up). We "judge enactments on the basis of reasonable legislative

---

[5] This is a hypothetical worry here, as the district court found "no evidence" supporting an assertion that Anderson manipulated the boundaries in a nefarious way.

purposes under the plain text of the legislation at issue." *Mitchell*, 2020 UT 26, ¶ 44 (cleaned up). "We will sustain a classification if we can reasonably conceive of facts which would justify the distinctions." *State v. Robinson*, 2011 UT 30, ¶ 24, 254 P.3d 183 (cleaned up).

¶37 The statutory text here promotes incorporation by providing sponsors multiple opportunities to redraw boundaries, provides finality by stopping endless boundary disputes, and protects the interests of landowners by various means, including feasibility requirements, exclusion rights, and the right to vote on the proposed incorporation. These are all legitimate objectives.

### C. *The Classification Is Reasonably Related To The Legitimate Legislative Objectives*

¶38 In the third and last point of the rational-basis inquiry, we ask "whether the legislature's classification is reasonably related to its legitimate objectives." *Merrill v. Utah Lab. Comm'n*, 2009 UT 26, ¶ 22, 223 P.3d 1089, *modified on reh'g,* 2009 UT 74, 223 P.3d 1099. The district court acknowledged that "preventing some landowners from leaving the proposed municipality at a certain point guarantees an end to boundary modifications," but then ruled that if the legislature provides exclusion rights it must give them to all similarly situated landowners.

¶39 We disagree. Under rational basis review, "any reasonable relationship between classification and purpose is adequate." *Tischmak*, 2025 UT 24, ¶ 39 (cleaned up). Having a cutoff to boundary modifications locks in the proposed boundaries, giving sponsors and opponents certainty and time to prepare for the incorporation election. It moves the incorporation process forward. That is a sufficient relationship for rational basis review.

¶40 While the legislature "could have chosen more lenient means to further these same objectives"—such as by permitting exclusion until the conclusion of both public hearings, when signatures are gathered for the ballot—"there is no requirement that an otherwise permissible classification be the best of all alternatives." *Angilau*, 2011 UT 3, ¶ 32. And here, despite any unfairness, the rights of landowners remain protected by the right to vote and by other safeguards, such as feasibility studies and contiguity requirements.

¶41 In sum, there is a reasonable relationship between the classification and legislative objectives identified by the parties.

## II. WHERE THE PARTIES BELOW DID NOT ADDRESS THE ORIGINAL MEANING OF THE UNIFORM OPERATION CLAUSE AND THIS COURT HAS ADDRESSED IT ALMOST ENTIRELY IN DICTA IN PRIOR CASES, WE WILL NOT ANALYZE IT FULLY FOR THE FIRST TIME HERE

¶42 Landowners argue that even if we were to conclude that the statutory scheme here passes the modern formulation of uniform operation, we should affirm on the alternative basis that it violates the original meaning of uniform operation. We decline to do so.

¶43 We have discretion whether to consider an alternative basis for affirmance. *Scott v. Scott*, 2020 UT 54, ¶ 31, 472 P.3d 897 (explaining that while we may "affirm the judgment appealed from if it [is] sustainable on any legal ground or theory apparent on the record," we have "no obligation to do so." (cleaned up)). Prudence counsels against considering an alternative ground if that ground was not ruled on by the lower court, was not adequately briefed on appeal, or deals with an unsettled area of law. *See, e.g., Kay v. Barnes Bullets*, 2022 UT 3, ¶ 20, 506 P.3d 530 (declining to address a legal question in the first instance "without the benefit of full briefing on the subject"); *Fire Ins. Exch. v. Oltmanns*, 2018 UT 10, ¶¶ 18, 20, 416 P.3d 1148 (declining to address an alternative argument because "the law in this area is unsettled" and "[w]e need adversarial briefing before we can fairly" decide the issue); *In re Estate of Willey*, 2016 UT 53, ¶ 16, 391 P.3d 171 (declining to rule on an unsettled area of law "because the parties do not adequately brief this issue, because other jurisdictions are split on this issue, and because resolution of this issue is not necessary to the disposition of this case"); *see also Siebach v. Brigham Young Univ.*, 2015 UT App 253, ¶ 36, 361 P.3d 130 ("Although we possess the ability to affirm on any legal ground or theory apparent on the record, we also possess the discretion to conclude that the district court should be afforded the opportunity to rule on the arguments in the first instance."); *R.O.A. Gen. Inc. v. Salt Lake City Corp.*, 2022 UT App 141, ¶ 39, 525 P.3d 100 (remanding to allow the district court to address a legal issue "in the first instance," because "we are mindful that we are a court of review, not of first view" (cleaned up)).

¶44 Each of those bases cuts against affirmance on an alternative ground here. Landowners raised the originalist argument for the first time in their opposition to Anderson's request for expedited briefing of this appeal. The district court never had the opportunity to consider and rule on this argument.

And while we commend Landowners for their thorough briefing of the history of the Uniform Operation Clause (and Anderson's analysis in response), the parties' briefing necessarily gave primary focus to the *modern* interpretation of uniform operation because that was the basis of the district court's ruling.

¶45 But the most salient reason we decline to reach Landowners' alternative argument is the unsettled nature of our uniform operation jurisprudence. Though we have discussed the original meaning in a few modern cases, we have done so mostly in dicta, either without conducting a full originalist inquiry[6] or by holding that the original understanding simply was not implicated.[7] We did decide in *Taylorsville City v. Mitchell* that a statute was "clearly constitutional under the original meaning of the Uniform Operation of Laws Clause," because the plaintiff "ha[d] not argued that similar defendants are being treated disparately within [the] classifications" created by the legislature.

---

[6] *See Count My Vote, Inc. v. Cox*, 2019 UT 60, ¶¶ 28–41, 452 P.3d 1109 (describing the historic understanding of the Uniform Operation Clause but then deciding the case under the modern interpretation without further discussion of the historical meaning); *Salt Lake City Corp. v. Utah Inland Port Auth.*, 2022 UT 27, ¶¶ 13–19, 524 P.3d 573 (same).

[7] *See DIRECTV v. Utah State Tax Comm'n*, 2015 UT 93, ¶¶ 47–48, 364 P.3d 1036 (noting that "the traditional (historical) application of the 'uniform operation' guarantee is directed to application or enforcement of the law by the executive" and holding that "[t]his strand of uniform operation analysis is not implicated" because "[t]he satellite providers are not complaining that the Tax Commission has granted special privileges or exemptions . . . [t]heir complaint concerns legislative classification"); *In re Adoption of J.S.*, 2014 UT 51, ¶ 66, 358 P.3d 1009 (noting "no tenable infringement of [the historic uniform operation] guarantee" because appellant's "complaint is with legislative classification, not practical operation"); *State v. Canton*, 2013 UT 44, ¶ 37, 308 P.3d 517 (holding that "[t]he historical requirement of consistent application or enforcement . . . is not at all implicated here, as Canton's gripe is that the statute sweeps *too* broadly;" that concern "runs precisely counter to that of the historical domain of uniform operation, which was to prescribe broad, uniform application across the entirety of a legislative class.").

2020 UT 26, ¶ 40. But we made this holding with only cursory analysis of the history of the Uniform Operation Clause, without attempting to reconcile our modern jurisprudence with the original understanding, discussing and distinguishing older cases, or otherwise setting forth a coherent standard for applying the original understanding. *See id.* ¶¶ 36–46. This area of the law remains unsettled.

¶46 True, Landowners have expressly invited us to use this case to "sharpen" our "slightly messy body of Uniform Operations jurisprudence." And in an appropriate case we would welcome that opportunity. But this is not the right case to engage in that "difficult task." It would be unusual to consider an affirmance on an alternative basis that would require us to engage in a thorough historical analysis, reconcile (and perhaps refute) conflicting jurisprudence, articulate the precise rule, and only then determine whether the legislative classification here violates that rule—which, at the end of the analysis, it may not, rendering the entire process academic. And we would have to do all of this without the benefit of a ruling by the district court and with less than full briefing by the parties. That is a fraught path we decline to take.

¶47 Accordingly, we exercise our discretion and decline to reach Landowners' originalist uniform operation argument.

## CONCLUSION

¶48 We reverse. The incorporation code creates classes of landowners and treats similarly situated landowners differently, but that treatment is reasonably related to the legitimate legislative purpose of preventing endless boundary changes so that incorporation questions can proceed to the ballot box. The code is constitutional under the modern understanding of the Uniform Operation of Laws Clause of the Utah Constitution.